# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Todd Michael,

                 Plaintiff,        Case No. 12-cv-13344
                                  Hon. Judith E. Levy
v.                             Mag. Judge Paul J. Komives

City of Troy Police Department
and City of Troy,

                 Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' [26] MOTION FOR SUMMARY JUDGMENT

Plaintiff Todd Michael is a police officer. He brings this action against his employers, defendants City of Troy Police Department ("Department) and the City of Troy ("City"), and his supervisor at the Department, Troy Police Chief Gary Mayer, for discrimination and retaliation in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* Michael alleges defendants violated the ADA by placing him on administrative leave and not returning him to his job because of certain medical conditions. He also alleges defendants retaliated against him for requesting a desk assignment and permission

to work outside the police department.    Before the Court is the defendants' Motion for Summary Judgment (Dkt. 26).  For the reasons discussed below, the Court will grant the motion.

## I.    Factual background

The following facts are undisputed unless otherwise noted. Michael was hired as a police officer by Troy in 1987.  (Dkt. 1, Compl. ¶ 13).   He was diagnosed with a brain tumor in March 2000, and underwent a craniotomy that same month to remove the tumor.  (Dkt. 30-2, Ex. A to Pl.'s Resp., Michael Dep. 10 [hereinafter "Michael Dep."]). Michael's tumor was initially diagnosed as cancerous; a second opinion correctly determined that Michael had  a meningioma, a non-malignant but, in this case, recurring brain tumor.   (*Id.* at 11-12).   Doctors performed a second craniotomy in March or April 2001 or 2002, and a third in March 2009.  (*Id.* at 12-13).   Michael underwent a follow-up radiosurgery in April or May 2009.  (*Id.* at 13).

### A.    The City's requirement that Michael undergo a neuropsychological evaluation

Because of certain incidents of what defendants regarded as odd behavior in the several months before plaintiff's third craniotomy,

defendants required Michael to undergo a neuropsychological evaluation to determine his fitness to return to work after the surgery. (Dkt. 26, Def.'s Br. 15; Dkt. 30-10, Ex. K to Pl.'s Br.). Concentra is the contractor responsible for the City's fitness evaluations. Concentra refers psychological evaluations to other contractors. (Dkt. 30-17, Ex. R to Pl.'s Resp., Sears Dep. 22 [hereinafter "Sears Dep."]). Concentra referred the City's request to Med-Eval, which in turn selected Dr. Firoza Van Horn to conduct Michael's neuropsychological evaluation. (*Id.*).

### B.    Dr. Van Horn's December 7, 2009 evaluation

Dr. Van Horn evaluated Michael on Dec. 7, 2009. (Dkt. 30-11, Ex. L to Pl.'s Br.). She interviewed and tested Michael at her office for 7 hours and 15 minutes. (*Id.* at 2). She spent another 9 hours reviewing testing data, Michael's medical records, and preparing her report. (*Id.*). Dr. Van Horn also reviewed the City's job description for a police officer in preparing the report. (*Id.*).

Dr. Van Horn found that Michael's test results "indicate several cognitive losses which are directly related to deteriorating brain functions . . . The specific deficits that Officer Michael demonstrates are

difficulty switching mental set and handling more than one task at a time, visual memory, tactile perception, problem solving and new learning ability." (*Id.* at 12). Dr. Van Horn concluded "there is convincing evidence that Officer Michael is not competent to handle his duties as a police officer." (*Id.*). Defendants received Van Horn's evaluation on December 18, 2009. (*See id.* at 2).

### C.   Dr. Mikkelsen's December 29, 2009 letter

By letter dated December 29, 2009, Michael's treating physician, Dr. Tom Mikkelsen, stated that "[i]n my professional opinion, Mr. Michael's medical condition in no way affects his ability to properly and adequately care for his children, and in no way affects his judgment or temperament." (Dkt. 30-12, Ex. M to Pl.'s Resp.). It is unclear from the record when defendants received this letter.

### D.   Officer Michael's January 23, 2010 placement on unpaid administrative leave

Defendants relied on Dr. Van Horn's evaluation in determining that Michael was "not able to perform the duties of a police officer." (Dkt. 30-13, Ex. N to Pl.'s Resp.; Sears Dep. 25). On January 20, 2010,

Michael was placed on unpaid administrative leave, effective January 23, 2010. (Dkt. 30-13, Ex. N to Pl.'s Resp.).

### E.   Dr. Liethen's February 1, 2010 evaluation

On his own initiative, Michael underwent a second neuropsychological assessment, conducted by Dr. Philip Liethen on February 1, 2010. (Dkt. 30-16, Ex. Q to Pl.'s Resp. 3). Dr. Liethen interviewed Michael and conducted neuropsychological tests. He also reviewed Dr. Van Horn's report. (*Id.* at 5). He does not appear to have reviewed the City's job description for a police officer. Dr. Liethen indicated that his findings were consistent with the findings in Dr. Van Horn's report. (*Id.* at 9). Dr. Liethen differed from Dr. Van Horn in his ultimate conclusions, however. Dr. Liethen concluded that his findings "do not indicate any functional incapacity or incompetency" and "do not indicate any basis for Mr. Michael not to return to duty as a police officer in the capacity in which he was serving premorbidly." (*Id.*). Dr. Liethen had no recommended restrictions. (*Id.*).

It is unclear when defendants received Dr. Liethen's report. Peggy Sears, the City's Human Resources Director who participated in the decision to place Michael on leave, recalled receiving Dr. Liethen's

report sometime after Michael was placed on leave. (Sears Dep. 29-30). While the copy of the report in the record bears a "received" date of March 5, 2010, that appears to correspond to a generation of an electronically signed copy of the report by Dr. Liethen. (Dkt. 30-16, Ex. Q to Pl.'s Resp. 2). At any rate, it appears that defendants had not received Dr. Liethen's report by July 22, 2010, when defendants' counsel, by letter to counsel for the Troy Police Officers' Association ("TPOA"), indicated that "[w]e do not have any records from examinations performed after Officer Michael's evaluation at Dr. Van Horn's office on December 7, 2009." (Dkt. 26-19, Ex. 18 to Defs.' Br. 3). It appears defendants may not have had Dr. Liethen's report at the time of Dr. Sewick's evaluation of Michael on August 11, 2010 (see below), as Dr. Sewick's report indicates he did not have Dr. Liethen's report. (Dkt. 30-22, Ex. W to Pl.'s Resp. 2).

### F.   Dr. Morad Daniel's June 10, 2010 review

The City's long-term disability insurance carrier, Standard, referred Michael's file to Dr. Morad Daniel for review. Dr. Daniel reviewed Michael's medical records, Dr. Van Horn's report, and Dr. Liethen's report. (*See* Dkt. 30-21, Ex. V. to Pl.'s Resp.). Dr. Daniel also

6

appears to have considered the job requirements of a police officer. (*See id.* at 2). Dr. Daniel concluded "there is no evidence of any active limitation that would preclude the claimant from performing his duties as a police officer on a regular basis." (*Id.* at 8). He found that Dr. Van Horn's assessment "concluded with several erroneous statements, which were not based on the claimant's actual test performance data." (*Id.*). Dr. Daniel found no limitations or restrictions on Michael's functional capacity at the time, but recommended a repeat claim review if Michael developed "recurrent seizures or new neurological symptoms." (*Id.* at 9).

### G.    Michael's union grievance and its resolution in June / July 2010

At some point in early 2010, the TPOA filed a grievance on behalf of Michael. The City had invoked Article 25 of the Collective Bargaining Agreement ("CBA") as the basis for requiring Michael's psychological evaluation. (*See* Dkt. 30-10, Ex. K to Pl.'s Resp.). The TPOA maintained that Article 37, not Article 25, was the applicable CBA provision. (Dkt. 30-15, Ex. P to Pl.'s Resp. 2). Article 25 governs medical examinations of officers. Article 37 governs psychological examinations of officers.

Article 37 provides that such exams shall include a fit / unfit for duty determination. (*Id.*). If the examiner determines the officer is unfit for duty, a doctor at a second facility must review the objective test results and interview the officer. (*Id.* at 3). If the second doctor disagrees with the conclusion of the first, a third doctor must review the test results and interview the officer. (*Id.*).

The TPOA and the City agreed that Article 37 would apply to Michael "for going forward purposes." (*Id.*). They also agreed that Dr. Van Horn's evaluation "will be considered the Employer's initial fitness for duty report," and that Van Horn's results would be sent to a doctor at a second facility for review, pursuant to Article 37. (*Id.* at 3-4).

By letter of July 14, 2010, the TPOA sought the City's full compliance with Article 37; specifically, an explanation of the circumstances underlying the initial order for psychological evaluation, and acknowledgment that the City had the test results to forward to the second doctor. (*Id.* at 5). At least the latter issue appears to have been resolved, as a second doctor, Dr. Bradley Sewick, interviewed Michael and reviewed Dr. Van Horn's test results on August 11, 2010. It is unclear from the record whether the former issue was resolved.

### H.    Dr. Bradley Sewick's August 11, 2010 evaluation

Michael was referred by Captain Scherlinck to Dr. Bradley Sewick for evaluation pursuant to Article 37.  (Dkt. 30-22, Ex. W to Pl.'s Resp. 2).   Dr. Sewick interviewed Michael for 1.5 hours and reviewed the City's job police officer job description, Dr. Van Horn's report and raw data, and Michael's medical records.  (*Id.* at 2, 5-7).   Dr. Sewick concluded that "I cannot in good conscience indicate that he can safely return to the full duties required of a police officer" based on his interview with Michael and his review of Dr. Van Horn's test results. (*Id.* at 8).

Dr. Sewick issued an addendum report on August 31, 2010, in which he stated:

> [i]t is my opinion that the problems that I see in areas of unstructured constructional capacities, motor problem solving, marginal cognitive set shifting capacities and compromised upper extremity sensory-motor functions can likely adversely impact job functions, particularly in areas of high speed defensive driving, split-second decision making, and the hand-to-hand application of force up to and including deadly force . . . I do unfortunately think that in the full capacities of a police officer, with these problems Officer Michael would pose a safety risk to himself and others under certain conditions.

9

(*Id.* at 9).

## I.    Dr. Linas Bielauskas' September 15, 2010 evaluation

Michael testified that his TPOA attorney advised him to have yet another neuropsychological evaluation. (Dkt. 30-2, Ex. B to Pl.'s Resp., Michael Dep. 105).  Dr. Liethen gave Michael the name of Dr. Linas Bielauskas.  (*Id.* at 105-06).  Dr. Bielauskas evaluated Michael on September 15, 2010.  Dr. Bielauskas interviewed Michael, administered neuropsychological tests, and reviewed the reports of Dr. Van Horn, Dr. Liethen, and Dr. Sewick.  (Dkt. 30-23, Ex. X to Pl.'s Resp.).  Dr. Bielauskas did not review Michael's medical records, although he did review Dr. Van Horn's, Dr. Liethen's, and Dr. Sewick's summaries of those records. (*Id.* at 4).

Dr. Bielauskas issued his report on October 11, 2010.  He concluded that Michael:

> is functioning generally within normal limits in most areas measured except for executive functioning, a weakness which is often seen with brain injury affecting the frontal part of the brain . . . Dr. Liethen did measure executive functioning somewhat, though more extensive evaluation of this with our test battery provided a consistent pattern of weakness in this regard.  Thus, in terms of occupational implications, it is my judgment that I cannot recommend

that the patient return to full patrol duties as a police
officer, a job description which requires quick planning,
judgment, and alteration of behavior in response to
circumstances.  Safety with use of weapons and high-speed
driving would be in question.  In all other respects, however,
the patient is intact and desk duty as a police officer,
including duties which require organization, attention, and
concentration, would be appropriate.

(*Id.* at 4-5).

On December 7, 2011, Michael asked to meet with Dr. Bielauskas
again.  (Dkt. 30-27, Ex. BB to Pl.'s Resp., Bielauskas Dep. 26).  Dr.
Bielauskas met with Michael and afterwards wrote an addendum to his
report.  The addendum is dated December 13, 2011.  (Dkt. 30-23, Ex. X
to Pl.'s Resp. 6-7).  Dr. Bielauskas confirmed his earlier conclusions, but
recommended that the Department directly test Michael's executive
functioning – specifically, by high-speed driving and "search and shoot"
tests.  Dr. Bielauskas suggested that passing such tests would confirm
Michael was capable of performing the duties of a police officer in spite
of his identified cognitive weaknesses.  (*Id.* at 7; Bielauskas Dep. 53).
However, Dr. Bielauskas anticipated that Michael "would have
difficulty" passing such tests.  (Bielauskas Dep. 28).

Michael did not provide defendants with a copy of Dr. Bielauskas' evaluation until after the start of this litigation.  (Sears Dep. 56; *see also* Michael Dep. 116).

### J.    Dr. Daniel Benincasa's January 11, 2011 review

Standard submitted Michael's medical reports and the evaluations of Dr. Van Horn, Dr. Liethen, Dr. Sewick, and Dr. Bielauskas to Dr. Daniel Benincasa for review on January 5, 2011.  (Dkt. 30-24, Ex. Y to Pl.'s Resp.).   Dr. Benincasa disagreed with Dr. Van Horn's and Dr. Bielauskas' reports.  (*Id.* at 5).   Dr. Benincasa agreed with Dr. Liethen and concluded that "[Michael] has work capacity in his prior occupation as a police officer," based on testing data and on Dr. Benincasa's assessment that Michael "has no deficits in ADLs and . . . looks to manage his life very well."  (*Id.*).

### K.    Michael's requests for a desk officer position and for leave to work outside the Department

By email of March 22, 2012, Michael requested a "civilian desk position" with the Department.  That request was denied by Captain Scherlinck in a letter dated April 5, 2012.  (Dkt. 26-47, Ex. 46 to Defs.' Br.).  The reason given for the denial was that Michael had previously

12

been found in unauthorized possession of confidential police records. (*Id.* at 2).

Michael submitted requests for permission to work outside of the Department dated October 2, November 8, and November 18, 2011, and April 9 and May 27, 2012. (Dkt. 26-36, Ex. 35 to Defs.' Br.). The proposed positions all involved security or "asset protection" and were denied for not conforming to the Department's regulations governing outside employment. (*Id.*; Dkt. 26-35, Ex. 34 to Defs.' Br. 2).

## L.   This litigation

Michael filed his complaint in this matter on July 30, 2012. (Dkt. 1). He brings two counts in his complaint: disability discrimination in violation of the ADA against all defendants (Count I), and retaliation in violation of the ADA against all defendants (Count II). Michael alleges he is not disabled, but is perceived as disabled by defendants (*Id.* ¶ 29).

Defendants allegedly discriminated against Michael by "constructively terminating" his employment and by refusing to provide his requested accommodation of permitting him to work outside of the Department. (*Id.* ¶¶ 44-45). Defendants allegedly retaliated against

Michael for "requesting accommodations, a return to assignment, or a release to work outside the police department." (*Id.* ¶ 49). The alleged retaliatory actions consisted of placing Michael on unpaid administrative leave, not returning him to work, denying him a reasonable accommodation, and refusing to permit him to take employment outside the Department. (*Id.* ¶ 50).

Defendants moved for summary judgment on both counts on October 14, 2013. The motion was fully briefed by the parties before the case was reassigned to this Court on May 13, 2014. A hearing on the motion was held on July 10, 2014.

## II.   Standard of review

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn

14

from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir.2002)).

The non-movant cannot, however, "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence" to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient." *Liberty Lobby*, 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-250. Furthermore, the trial court is not obligated "to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d 1479-80.

## III.   Analysis

### A.   Plaintiff's stipulation to dismiss defendant Mayer and Count II

As a preliminary matter, the Court entered an order on July 23, 2014, pursuant to the parties' stipulation, dismissing defendant Mayer from the case and dismissing Count II as to the remaining defendants.

(Dkt. 34).   The Court's analysis will therefore focus on whether the Department and the City are entitled to summary judgment on Count I.

### B.   Plaintiff's discrimination claim (Count I) is a "regarded as disabled" claim

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8).

To establish a prima facie case of employment discrimination under the ADA, a plaintiff must show that 1) he is disabled; 2) he is otherwise qualified for the position, with or without reasonable accommodation; 3) he has suffered an adverse employment decision; 4) defendants knew or had reason to know of plaintiff's disability; and 5) the position remained open while defendants sought applicants, or

16

plaintiff was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

A person is considered disabled under the ADA if he has "a physical or mental impairment that substantially limits one or more major life activities," or "a record of such an impairment," or is "regarded as having such an impairment." 42 U.S.C. § 12102(1). A person is "regarded as" disabled if "he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A).

Michael alleges in his complaint that he has no disability, but is perceived as disabled by defendants. (Dkt. 1, Compl. ¶ 29). In a single sentence in his response brief, however, Michael states, "There is a material question of fact as to whether Michael is disabled." (Dkt. 30, Pl.'s Resp. 31). Accordingly, the Court must treat Michael's discrimination claim as a so-called "regarded as" claim. *See Jennings*, 2013 WL 1962333, at *9.

### C.   Defendants' lack of duty to provide a reasonable accommodation

It is the law of this Circuit that "a finding of regarded-as disability . . . obviate[s] an employer's responsibility to offer reasonable accommodation to an employee." *Baker v. Windsor Republic Doors*, 414 F. App'x 764, 776 (6th Cir. 2011) (citing *Workman v. Frito-Lay, Inc.*, 165 F.3d 460 (6th Cir. 1999)). Defendants are accordingly entitled to summary judgment on the issue of their alleged failure to accommodate Michael's "perceived disability." (*See* Dkt. 1, Compl. ¶¶ 33-34).

Even if Michael were entitled to a reasonable accommodation, summary judgment would still be appropriate. The accommodations Michael requested were 1) a desk officer position with the Department, and 2) leave to pursue several employment opportunities outside the Department. (Dkt. 1, Compl. ¶ 34; *see also* Michael Dep. 75). Defendants have articulated legitimate, nondiscriminatory reasons for denying those requests.

According to defendants, the desk officer position necessarily entails access to confidential Department files. (Dkt. 26-47, Ex. 46 to Defs.' Br. 2). Defendants maintain that Michael has previously been found in unauthorized possession of such files, and therefore cannot be entrusted with a desk officer position. (Dkt. 26, Defs.' Br. 43-44; Dkt.

26-47, Ex. 46 to Defs.' Br. 2).  Michael admits to possession of the file in question (Michael Dep. 131-33).   "Once an employer articulates a legitimate, nondiscriminatory reason for its action, the plaintiff must then show that the reason given by the employer is pretextual in order to prevail."  *Bare v. Fed. Exp. Corp.*, 886 F. Supp. 2d 600, 612 (N.D. Ohio 2012) (quoting *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 810 (6th Cir.1999).  Michael offers no evidence that the reason for not offering him the desk officer position was pretextual.

Between October 2011 and May 2012, Michael submitted five applications for leave to work outside the Department.  (Dkt. 26-36, Ex. 35 to Defs.' Br.).  Each job involved providing security or "asset protection."  (*See id.*).  Each application was denied for not comforming to Department regulations prohibiting outside employment as a private guard.  (Dkt. 26-37, Ex. 36 to Defs.' Br.; Dkt. 26-35, Ex. 34 to Defs.' Br. 2).  Michael offers no evidence that this reason was pretextual.

Even though Michael does not allege he is disabled, and therefore does not qualify for a reasonable accommodation, he has not presented any evidence that defendants' denials of his request to work a desk job and his requests to work outside the Department were pretextual.

Defendants are thus entitled to summary judgment on Michael's failure to accommodate claim.

### D.   Whether Michael was "otherwise qualified" for the police officer position

Michael also claims defendants discriminated against him in violation of the ADA by placing him on unpaid administrative leave. Defendants argue Michael cannot establish the second element of his prima facie case of discrimination – namely, that he is "otherwise qualified" to work as a police officer. *See Whitfield*, 639 F.3d at 259. To establish that he is "otherwise qualified" as a police officer, Michael must show that he "satisfied the prerequisites for the position" and "can perform the essential functions of the position . . . with or without reasonable accommodation." *Burns v. Coca-Cola Enterps., Inc.*, 222 F.3d 247, 256 (6th Cir. 2000).

As discussed above, however, defendants had no obligation to provide Michael with a reasonable accommodation.  Michael must therefore establish that he can perform the essential functions of a patrol officer without a reasonable accommodation.  According to

defendants, the neuropsychological evaluations of Dr. Van Horn, Dr. Sewick, and Dr. Bielauskas confirm that he cannot.

It is undisputed that defendants placed Michael on unpaid administrative leave based on Dr. Van Horn's evaluation.  It is further undisputed that defendants relied on the evaluations of Dr. Van Horn and Dr. Sewick to make a final determination that Michael was not qualified to perform the essential functions of a police officer.  (Dkt. 26, Defs.' Br. 38).  Defendants maintain they reasonably relied on both evaluations in making those decisions.  Defendants also point to Dr. Bielauskas' evaluation as additional confirmation of Michael's inability to perform the essential functions of a police officer.

Michael advances several arguments in opposition to defendants' motion.  First, he argues that defendants should not have relied on Van Horn's evaluation for two reasons: because it was not conducted pursuant to the proper article of the CBA, and because it was "incomplete and inadequate." (Dkt. 30, Pl.'s Resp. 10).[1]   Second,

---

[1] Michael does not contest that Dr. Sewick's report qualifies as an individualized inquiry.  Rather, Michael argues that Dr. Sewick's report is biased, because of a professional connection between Dr. Sewick and Dr. Van Horn.  (Michael Dep. 93; *see also* Dkt. 30-20, Ex. U, Liethen Aff. ¶ 8).  Other than the fact of a connection, however, Michael presents no evidence of bias in Dr. Sewick's report.

Michael argues that a genuine dispute of material fact exists as to whether Michael could perform the essential functions of a Troy police officer. (*Id.* at 27). Specifically, Michael points to the evaluations of Dr. Liethen, Dr. Benincasa, and Dr. Daniel as evidence that he can, in fact, perform the essential functions of a police officer. (*Id.*). Third, Michael claims a material question of fact exists "as to whether the Defendants are imposing the same essential functions on all of its officers"; namely, whether defendants evaluate other officers' physical fitness in relation to the essential functions of a police officer. (*Id.* at 29, 31).

 1. <u>The purported invalidity of Dr. Van Horn's evaluation under the CBA</u>

Defendants do not dispute that Dr. Van Horn's evaluation was conducted pursuant to the incorrect provision of the CBA. But that defect was cured, according to defendants, by the agreement between the City and the TPOA to designate Dr. Van Horn's evaluation as the first evaluation required under the correct provision of the CBA, Article 37. Michael maintains the agreement between the City and the TPOA did not waive the "initial impropriety" of Dr. Van Horn's evaluation. (Dkt. 30, Pl.'s Resp. 11).

The validity of Dr. Van Horn's evaluation for purposes of the CBA bears no relationship to its validity for purposes of the ADA.  Nothing in the ADA or in the relevant case law, regulations, or interpretive guidance suggests otherwise.   Whether Dr. Van Horn's evaluation conformed to the CBA therefore has no bearing on the Court's decision here.

2.  The adequacy of Dr. Van Horn's evaluation

a.  Individualized inquiry

An employer may, in certain circumstances, rely on the results of a medical examination to determine that a person cannot perform the essential functions of a position for purposes of the ADA.  *See Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 15 (6th Cir. 2012); *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 665 (6th Cir. 2008).   Specifically, the ADA "mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position." *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000).

An individualized inquiry is one that focuses on "the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question." *Id.* An inquiry meets this requirement if the examining doctor is familiar with the relevant job duties, obtains "much individualized information" about the employee's medical condition, has current knowledge of the employee's medical condition, examines the employee in person, and reviews the records of the employee's other treating physicians. *Wurzel*, 482 F. App'x at 15; *Jennings v. Dow Corning Corp.*, No. 12-12227, 2013 WL 1962333, *10 (E.D. Mich. May 10, 2013).

The Court will first determine whether the evaluations relied upon by defendants to find Michael not qualified for the position of police officer meet the standard for an individualized inquiry. If they do, the Court will then determine whether defendants' reliance on those evaluations was reasonable in light of other evaluations concluding that Michael was fit to return to his position with no restrictions.

   b. <u>Dr. Van Horn's evaluation</u>

24

Dr. Van Horn interviewed Michael in person and administered a series of neuropsychological tests, for a total of 7 hours and 14 minutes (Dkt. 26, Ex. 13 to Defs.' Br.).  She reviewed medical records related to Michael's surgeries and reviewed the City of Troy's police officer job description (*Id.*).  She spent 9 hours reviewing these records, her test data, the interview results, and producing a report. Dr. Van Horn's evaluation is comparably thorough to the medical assessment in *Wurzel* and thus qualifies as an individualized inquiry for purposes of the ADA.

### c. Dr. Sewick's evaluation

Dr. Sewick evaluated plaintiff on Aug. 11, 2010.  (Dkt. 30-22, Ex. W to Pl.'s Resp. 2).  Dr. Sewick interviewed plaintiff, reviewed the raw data from Dr. Van Horn's neuropsychological testing of plaintiff, reviewed the City's police officer job description, and reviewed the medical records related to plaintiff's surgeries (*Id.* at 5-7).

Defendants maintain that Dr. Sewick's report qualifies as an individualized inquiry, even though Dr. Sewick did not himself test plaintiff, but relied on the raw data from Dr. Van Horn's testing (Dkt. 26, Defs.' Br. 34).

Defendants cite to *Jennings*, 2013 WL 1962333, at *11, in support of this position (*Id.* at 34).  That case involved a scenario different from the one here: the evaluating doctor did not himself test the plaintiff, but reviewed and discussed findings made by his assistant during an examination.  *Jennings*, 2013 WL 1962333, at *11.

The difference carries little weight, however, because plaintiff does not contest the validity of Dr. Van Horn's testing data, but rather the validity of the conclusions Dr. Van Horn drew from the data.  In fact, Dr. Liethen, on whose evaluation plaintiff primarily relies, confirmed that his "overall findings are consistent with the data documented in [Dr Van Horn's] report," although he came to contrary conclusions based on that data.  (Dkt. 30-16, Ex. Q to Pl.'s Resp. 9).

Based on Dr. Sewick's personal interview of Michael and Dr. Sewick's review of Dr. Van Horn's raw testing data, the City's police officer job description, and Michael's medical records, the Court finds that Dr. Sewick's evaluation qualifies as an individualized inquiry under *Wurzel*.

      d. <u>Dr. Bielauskas' evaluation</u>

26

Defendants argue that Dr. Bieliauskas' evaluation of plaintiff also qualifies as an individualized inquiry. (Dkt. 26, Defs.' Br. 36). Dr. Bieliauskas interviewed plaintiff in person, administered neuropsychological tests, reviewed the City's job description for a police officer, and reviewed plaintiff's medical records. Dr. Bieliauskas' evaluation qualifies as an individualized inquiry.

e. <u>Whether defendants reasonably relied on Dr. Van Horn's and Dr. Sewick's evaluations</u>

Defendants thus relied upon individualized inquiries into Michael's neuropsychological condition to determine that he was not qualified for the police officer position. Michael nonetheless contends that reliance was unreasonable, given the evaluations and reviews of Dr. Liethen, Dr. Daniel, and Dr. Benincasa. Michael makes two arguments based on these evaluations: first, that Dr. Van Horn's evaluation was flawed, and second, that Michael is, in fact, able to perform the essential functions of a police officer.

As an initial matter, it is not clear that Dr. Liethen's, Dr. Daniel's, and Dr. Benincasa's opinions are relevant here, as "the ADA does not provide for a plaintiff to challenge the reasonable medical judgment an

employer relies upon." *Jennings*, 2013 WL 1962333, at *12. The Court will nonetheless assess Michael's challenges to defendants' reliance on Dr. Van Horn's and Dr. Sewick's evaluations.

i.   Dr. Liethen's and Dr. Benincasa's criticisms of Dr. Van Horn's and Dr. Sewick's evaluations

Dr. Liethen expresses several criticisms of Dr. Van Horn's and Dr. Sewick's evaluations. Chief among them are the following: first, Dr. Liethen believes Dr. Van Horn and Dr. Sewick overemphasize executive functioning in their analyses. (Dkt. 30-20, Ex. U to Pl.'s Resp., Liethen Aff. ¶ 30 [hereinafter "Liethen Aff."]). Dr. Benincasa echoes this criticism. (Dkt. 30-24, Ex. Y to Pl.'s Resp. 5). Second, Dr. Liethen criticizes Dr. Van Horn's and Dr. Sewick's chosen range descriptor system. (Liethen Aff. ¶ 15, 17). Third, Dr. Liethen finds two of the tests employed by Dr. Van Horn and Dr. Sewick to be "archaic and obsolete." (*Id.* ¶ 24). Fourth, Dr. Liethen believes that Dr. Sewick misrepresented that he reviewed Dr. Van Horn's raw testing data. (*Id.* ¶ 25). Fifth, Dr. Liethen states that data from two executive functioning tests – the category test and the Rey 15 test – are missing from Van Horn's data. (*Id.* ¶ 11).

28

Dr. Liethen states in his affidavit that multiple range descriptor systems are "commonly accepted in the field of neuropsychology" and that "there is no single 'guidelines established' system for range descriptors." (Liethen Aff. ¶ 15, 16). He also states that Dr. Van Horn's methods for testing executive functioning are "conventional." (*Id.* ¶ 10).

As for the remaining criticisms, Dr. Liethen offers nothing other than his bare assertion that Dr. Sewick did not review Dr. Van Horn's data. Dr. Liethen does not indicate the basis for this claim; in particular, he does not claim to have personal knowledge that Dr. Sewick did not, in fact, review Dr. Van Horn's raw data in preparing his own report. Regarding the missing test data, Dr. Van Horn's report does give a score for the "Rey 15 Memory test," one of the two tests for which the raw data is purportedly missing. And if some test data is, in fact, missing from Dr. Van Horn's raw test data, the import of that is unclear. Again, Dr. Liethen indicated his test results were consistent with Dr. Van Horn's, even if the conclusions they drew from those results differed. (*See* Dkt. 30-16, Ex. Q to Pl.'s Resp. 9). And Michael's score for the category test administered by Dr. Bielauskas was

29

"consistent with brain dysfunction."  (Dkt. 30-27, Ex. BB to Pl.'s Resp.,

Bielauskas Dep. 16-18).

In sum, Michael has not shown that Dr. Van Horn's and Dr.

Sewick's evaluations were objectively unreasonable and that defendants

were unreasonable to rely on those evaluations in determining Michael

was not qualified to return to duty as a police officer.

ii.    <u>Whether defendants were unreasonable not to consider<br>Dr. Liethen's, Dr. Daniel's, and Dr. Benincasa's reports</u>

Michael also argues that the evaluations of Dr. Liethen, Dr.

Daniel, and Dr. Benincasa show that he is able to perform the essential

functions of a police officer.  Defendants were unreasonable, according

the Michael, not to consider those evaluations in making their

determination as to Michael's fitness to work as a police officer.

Critically, Dr. Liethen expressly did not consider the City's police

officer job description in reaching his conclusion that Michael was fit to

return to work.  Dr. Liethen disclaims the relevance of Michael's job

description – stating, for example, in his affidavit that "There are no

standard or recognized norms of capacity or functioning for a police

30

officer in particular." (Liethen Aff. ¶ 4). On this basis alone, Dr. Liethen's evaluation fails to qualify as an individualized inquiry. *See Wurzel*, 482 F. App'x at 15. Furthermore, Dr. Liethen testified that information about Michael's activities of daily living ("ADL") played a role in his conclusions, but also testified that he did not know certain information about Michael's ADL that might have changed his conclusions. (*See* Liethen Dep. 29, 38-42). It was thus not unreasonable for defendants, whenever they received Dr. Liethen's report, to reject its conclusion that Michael was fit to return to duty as a police officer with no restrictions. (*See* Sears Dep. 30; *supra* part I.E); *Wurzel*, 482 F. App'x at 16 (finding employer's decision to favor recommendations of its own physician and an independent medical examiner and cardiologist over plaintiff employee's treating cardiologists reasonable, because the latter "did not have current and complete information when making their recommendations").

Neither Dr. Daniel nor Dr. Benincasa interviewed Michael in person. Dr. Benincasa relied on Dr. Liethen's report to find that Michael "has no deficits in ADLs and . . . looks to manage his life very well." (Dkt. 30-24, Ex. Y to Pl.'s Resp. 5). Dr. Benincasa then based his

31

conclusions in part on that finding.  But Dr. Liethen did not have information that might have altered his assessment of Michael's ADLs. In short, neither Dr. Daniel's nor Dr. Benincasa's evaluation is sufficiently thorough to qualify as an individualized inquiry.  It was therefore not unreasonable for defendants not to adopt Dr. Daniel's or Dr. Benincasa's conclusions that Michael was fit to return to police officer duty. *See Wurzel*, 482 F. App'x at 16.

    3. <u>Whether a genuine dispute of material fact exists as to whether Michael can perform the essential functions of a police officer</u>

For the reasons already discussed above, Michael has not shown the existence of a genuine dispute as to whether he can perform the essential functions of a police officer.

    4. <u>Whether defendants require all officers to perform the essential functions of a police officer</u>

Finally, Michael argues that a genuine dispute of material fact exists as to whether defendants evaluate all officers with respect to the essential functions of the police officer position.  Specifically, Michael argues that physical fitness is important to an officer's ability to

perform the essential functions of the position, yet the Department does not remove officers from duty who become physically unfit.

Even if there is a genuine factual dispute as to this issue, it is not a material one. Whether other officers should be determined unfit to work as a police officer has no bearing on whether defendants' determination as to Michael was legitimate.

## IV.   Conclusion

Officer Michael's commitment to resume work as a police officer and his perseverance through serious health difficulties are remarkable. But he has not presented sufficient evidence that he is "otherwise qualified" under the ADA to work as a Troy police officer. Accordingly, defendants' Motion for Summary Judgment (Dkt. 26) is GRANTED; and

Plaintiff's Complaint (Dkt. 1) is DISMISSED with prejudice. This is a final order and closes the case.

IT IS SO ORDERED.


Dated: October 21, 2014              /s/Judith E. Levy
Ann Arbor, Michigan                  JUDITH E. LEVY
                                     United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 21, 2014.


/s/Felicia M. Moses
FELICIA M. MOSES
Case Manager